IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SHAWN D. TAYLOR,                          :
    Plaintiff,                            :
                                          :
v.                                        :      CIVIL ACTION NO. 23-CV-4031
                                          :
COUNTY OF CHESTER, *et al.*                :
    Defendants.                           :


### MEMORANDUM

**BARTLE III, J.**                                    **NOVEMBER 6, 2023**

    Plaintiff Shawn D. Taylor, a pretrial detainee currently incarcerated at the Chester County Prison ("CCP"),[1] filed this civil rights action pursuant to 42 U.S.C. § 1983 based on the conditions in which he is confined.  Taylor seeks to proceed *in forma pauperis*.  For the following reasons, the Court will grant Taylor leave to proceed *in forma pauperis* and dismiss his Complaint in part pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii).  Because some of Taylor's claims will be dismissed without prejudice, he will be granted the option of proceeding only on the claims the Court concludes pass statutory screening or filing an amended complaint to attempt to cure the defects discussed below.

## I.    FACTUAL ALLEGATIONS

    Taylor named the following Defendants in his Complaint:  (1) the County of Chester; (2) Prime Care Medical, Inc.; (3) Warden Ronald Phillips; and (4) Deputy Warden Roberts. (Compl. at 2.)[2]  He sued Warden Phillips and Deputy Warden Roberts in their individual and

---

[1] Although Taylor is convicted, he is classified as a pretrial detainee because he has not yet been sentenced.  *See Stevenson v. Carroll*, 495 F.3d 62, 67 (3d Cir. 2007).

[2] The Court adopts the pagination supplied by the CM/ECF docketing system.

official capacities.  (*Id.* at 4.)  Taylor indicates that the events and conditions giving rise to his claims began on July 14, 2023, when he was initially incarcerated at CCP following his conviction,[3] and have been ongoing through the present.  (*Id.* at 7, 10.)

Taylor alleges that upon his admission to CCP on July 14, 2023, he was interviewed by an "intake nurse" and had his prescriptions transferred from a local pharmacy, including prescriptions for Dulera and Albuterol, both inhalers his physician prescribed for asthma.  (*Id.* at 11; *see also id.* at 14 ("My Dulera inhaler was prescribed by my physician years ago."); *id.* at 25 (explaining in a grievance that Taylor has been prescribed Dulera and Albuterol for asthma).) Taylor was initially housed in "Med Bay" in a cell that "appeared to be a single cell converted into a multiple person cell."  (*Id.* at 11.)  He and his cell mate were told to strip naked and "put on what is commonly called the 'turtle suit.'"  (*Id.*)  The velcro on the suits was allegedly worn to the point that the suits "would not stay on," so Taylor and his cell mate were "both basically naked."  (*Id.*)  Taylor alleges that his cell mate later told him that guards encouraged him to "take his frustrations out on [Taylor] for having to wear the turtle suit."  (*Id.*)

Taylor was housed on "Med Bay" until approximately July 20, 2023, for a total of about six days.  (*Id.*)  During that time, he was allegedly "denied access to preventative and corrective care for asthma" because he was "not permitted access to [his] prescribed inhalers or any asthma treatment."  (*Id.* at 12.)  Approximately three days into his stay, Taylor began having asthma attacks but still was not able to access his inhalers.  (*Id.*)  He was told to "take some pills twice a day," which he did, although it is not clear whether this was intended as his treatment for asthma or whether this allegation pertains to another issue.  (*Id.*)

---

[3] *See Commonwealth v. Taylor*, CP-15-CR-0002497-2021 (Chester C.P.).

The Complaint describes several other conditions on Med Bay.  Taylor claims that he

overheard guards threatening someone in the cell next to his.  (*Id.*)  He also alleges that his cell

lacked running water, such that the toilet would not flush and he could not wash his hands; that

he "occasionally" had access to toilet paper; that he was denied access to a telephone; that there

was no natural light in his cell; that the artificial light in his cell stayed on all day and night; and

that he was not allowed outside.  (*Id.* at 12-13.)  Taylor further contends that he was "required to

sleep on the floor and less than a foot from the toilet that did not flush," and that he only had one

shower during his six-day stay in Med Bay.  (*Id.* at 13.)  Additionally, Taylor's lawyers

attempted to visit him on July 19, but were not able to do so because he was on "lock status," so

Taylor had to connect with them by phone instead.  (*Id.*)

On approximately July 20, Taylor was moved to a cell on R-Block, which he shared with

his former cell mate from Med Bay.  (*Id.*)  Medication calls occurred three times daily on the

unit, but although Taylor asked for his asthma medications and "was constantly informing the

nurse at medication calls that [he] was prescribed Dulera for asthma," he did not receive his

inhalers.  (*Id.*)  During a medical appointment, a nurse told him, "we do NOT provide

preventative inhalers."  (*Id.*)  However, a Dulera inhaler that Taylor's family provided upon his

admission to CCP "finally showed up during a visit to one of the medication calls"

approximately two weeks after it had been dropped off.  (*Id.* at 14.)  Taylor alleges that the

inhaler he received from his family "has now been used up," leaving him without care for his

asthma because "Prime Care and the County of Chester have a blanket policy to not provide

preventative asthma inhalers or treatment."  (*Id.*)  In the meantime, Taylor alleges that he has

continued to "endure asthma attacks" and that his "constant requests" for care, sick call slips, and

grievances were ignored.  (*Id.* at 13-15.)  According to Taylor, he was told by a nurse to "hit the

'call button'" in his cell if he needed "rescue asthma treatment." (*Id.* at 15.)  However, when he did so on July 27, 2023, he was allegedly ignored.  (*Id.*)  He also claims that Prime Care "ignores" his "sick calls" and cannot bring him to the medical department due to "severe understaffing."  (*Id.*)

Taylor further alleges that he was denied care for a toenail that fell off while he was incarcerated on R-Block.  (*Id.*)  He saw a "nurse in medical" regarding the toenail but "was told [he] won't be treated since Chester County Prison is only a temporary prison for inmates."  (*Id.*)  The nurse also told Taylor that he could "get a pill to cure [the] toenail fungal infection if [he] left Chester County Prison."  (*Id.*)  Taylor alleges that he has experienced pain from the toenail while wearing the "old and ripped shoes" provided to him.  (*Id.*)

Additionally, Taylor claims to have been denied treatment for cavities.  He alleges that he began experiencing tooth pain and sensitivity while housed on R-Block and that he was told by the dentist that "the only option was to pull the tooth" because "there are no options at Chester County Prison for cavity fillings or a root canal even if that is the correct treatment."  (*Id.* at 16.)  He was also denied a "teeth cleaning," allegedly for "non-medical reasons."  (*Id.*)  As a result of his dental issues, Taylor alleges that he continues to experience pain and discomfort when eating and drinking.  (*Id.*)  He further notes that inmates are not permitted to have dental floss, are only given a small amount of toothpaste on intake, and are expected to buy dental and other hygiene products.  (*Id.* at 15-16.)

Finally, Taylor claims he was ignored for ten days despite submitting two medical slips for "stomach issues and chronic diarrhea."  (*Id.* at 16.)  It appears he saw a nurse at some point, and the Complaint implies that he was treated at that time, although the specifics are unclear.  (*Id.*)  Taylor "believe[s] [he] lost 10 pounds during this time."  (*Id.*)

Taylor also describes events and conditions related to a lock down that occurred during his incarceration at CCP.  In that regard, Taylor alleges that, although R-Block is not a high security block, he was "on lock down" for approximately twelve days because another inmate escaped.  (*Id.*)  During that time, inmates were required to eat in their cells.  (*Id.*)  Taylor claims that being inside during this period impacted his mental health and breathing because the "air quality inside [his] cell can get really bad especially as an asthmatic."  (*Id.*)  According to Taylor, the escape was not surprising because the cell block doors do not always lock.  (*Id.* at 16-17.)  He notes that his cell door "routinely [had] locking issues" and that on one occasion, the issue could not be fixed by maintenance, and he was moved to a different cell for a period of time.  (*Id.* at 17.)  According to Taylor, the issues regarding the cell doors impacted his "safety from other prisoners in R-Block" because he has observed three "bloody fights" in less than three months. (*Id.*)

Based on those allegations, Taylor asserts claims for violations of his First Amendment right to "freedom of speech," his Eighth Amendment rights, and his Fourteenth Amendment rights attributable to the Defendants' policies and customs.  (Compl. at 5.)  He contends that the County of Chester, Warden Phillips, and Deputy Warden Roberts "continued to use policy, procedure and customs" violating these rights in four respects.  (*Id.* at 7.)  First, Taylor alleges that he was "refused access to complain, voice or griev[e] his concerns over medical, security and injures," which he attributes to a "custom and procedure" to "ignore, refuse or punish" him when he attempted to raise an issue, including by improperly placing him in suicide protocol and not permitting him to meet with his attorney.  (*Id.*; *see also id.* at 18 (alleging Taylor was placed in "medical observation classification when he was not suicidal nor homicidal as punishment due to charges and [his] attempt to use his right to freedom of speech and access to complain and find

remedy").)  Second, Taylor alleges that he has been refused access to preventative and corrective

care for his teeth, specifically with regard to his cavities, because the "county approved a custom

of only granting teeth to be pulled even when cavity repairs are needed."  (*Id.* at 8.)  Third,

Taylor alleges that he was refused access to prescribed asthma treatment due to Defendants'

"policy of (no) breathing treatments throughout the day," amounting to deliberate indifference to

his medical needs.  (*Id.*; *see also id.* at 14 (alleging that CCP "was deliberately indifferent to

[Taylor's] asthma since [he] was denied access to preventative care" and that "Prime Care and

the County of Chester remain deliberately indifferent to [his] serious medical needs by refusing

preventative care despite knowing [he has] asthma and require[s] Dulera to breathe.").)  Fourth,

Taylor alleges that he "has been subject to all the malicious evil behavior by defendants as they

continue to cause harmful procedures, customs of harassment and mentally painful treatment" by

failing to train their officers and "forcing undertrained officers to work 16 hr shifts with no

administrative control or backup support."  (*Id.* at 8-9.)  Taylor further alleges that Defendants

Prime Care Medical and Deputy Warden Roberts "adopted, used policy, procedures to avoid

medical treatments" for dental care and asthma, which resulted in deliberate indifference to his

serious medical needs.  (*Id.* at 9.)  Finally, Taylor contends that all of the Defendants "knowingly

ignored and followed a procedure well known and accepted" at CCP to "'fail to act' or protect

[him] from all the malicious evil behavior" alleged in the Complaint.  (*Id.* at 10.)

As a result of these alleged constitutional violations, Taylor has experienced pain and

suffering due to multiple cavities, as well as breathing problems and asthma attacks.  (*Id.* at 18.)

He seeks damages and assorted injunctive relief.  (*Id.* at 19-20.)

II.    **STANDARD OF REVIEW**

The Court will grant Taylor leave to proceed *in forma pauperis* because it appears that he is incapable of paying the fees to commence this civil action.[4]  Accordingly, 28 U.S.C. § 1915(e)(2)(B)(ii) requires the Court to dismiss the Complaint if it fails to state a claim.  Whether a complaint fails to state a claim under § 1915(e)(2)(B)(ii) is governed by the same standard applicable to motions to dismiss under Federal Rule of Civil Procedure 12(b)(6), *see Tourscher v. McCullough*, 184 F.3d 236, 240 (3d Cir. 1999), which requires the Court to determine whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quotations omitted); *Talley v. Wetzel*, 15 F.4th 275, 286 n.7 (3d Cir. 2021).  "At this early stage of the litigation,' '[the Court will] accept the facts alleged in [the *pro se*] complaint as true,' 'draw[] all reasonable inferences in [the plaintiff's] favor,' and 'ask only whether [that] complaint, liberally construed, . . . contains facts sufficient to state a plausible [] claim.'" *Shorter v. United States*, 12 F.4th 366, 374 (3d Cir. 2021) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 774, 782 (7th Cir. 2015)).  Conclusory allegations do not suffice. *Iqbal*, 556 U.S. at 678.  As Taylor is proceeding *pro se*, the Court construes his allegations liberally. *Vogt v. Wetzel*, 8 F.4th 182, 185 (3d Cir. 2021) (citing *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244-45 (3d Cir. 2013)).

III.    **DISCUSSION**

Taylor asserts his constitutional claims pursuant to § 1983, the vehicle by which federal constitutional claims may be brought in federal court.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and

---

[4] Because Taylor is a prisoner, he must still pay the $350 filing fee in installments as mandated by the Prison Litigation Reform Act.

must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

>  A.      **Claims Against Chester County and Prime Care**

To plead a § 1983 claim against a municipality, such as Chester County, or a medical contractor who provides medical services at a county prison, such as Prime Care, a plaintiff must allege that the municipality's policy or custom caused the violation of his constitutional rights. *See Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 694 (1978); *see also Natale v. Camden Cnty. Corr. Facility*, 318 F.3d 575, 583 (3d Cir. 2003) (applying *Monell* to claims against medical contractor). "To satisfy the pleading standard, [the plaintiff] must . . . specify what exactly that custom or policy was." *McTernan v. City of York, PA*, 564 F.3d 636, 658 (3d Cir. 2009). "'Policy is made when a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy, or edict.'" *Estate of Roman v. City of Newark*, 914 F.3d 789, 798 (3d Cir. 2019) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990)). "'Custom, on the other hand, can be proven by showing that a given course of conduct, although not specifically endorsed or authorized by law, is so well-settled and permanent as virtually to constitute law.'" *Id.* (quoting *Bielevicz v. Dubinon*, 915 F.2d 845, 850 (3d Cir. 1990)).

It is not enough, however, to allege the existence of a policy or custom. "A plaintiff must also allege that the policy or custom was the 'proximate cause' of his injuries." *Id.* (citing *Kneipp v. Tedder*, 95 F.3d 1199, 1213 (3d Cir. 1996)). This can be done "by demonstrating an 'affirmative link' between the policy or custom and the particular constitutional violation" alleged. *Id.* (quoting *Bielevicz*, 915 F.2d at 850). For a custom to be the proximate cause of an injury, a plaintiff must establish that the defendant "had knowledge of similar unlawful conduct

8

in the past, failed to take precautions against future violations, and that its failure, at least in part,

led to [the plaintiffs'] injury." *Id.* (internal quotations and alterations omitted).  In other words,

"[c]ustom requires proof of knowledge and acquiescence by [a municipal] decisionmaker."

*McTernan*, 564 F.3d at 658; *see also Baker v. Monroe Twp.*, 50 F.3d 1186, 1191 (3d Cir. 1995)

(to establish municipal liability, the plaintiffs "must show that a policymaker for the Township

authorized policies that led to the violations or permitted practices that were so permanent and

well settled as to establish acquiescence").

A plaintiff may also state a basis for municipal liability by "alleging failure-to-

supervise, train, or discipline . . . [and alleging facts showing] that said failure amounts to

deliberate indifference to the constitutional rights of those affected." *Forrest v. Parry*, 930 F.3d

93, 106 (3d Cir. 2019).  "This consists of a showing as to whether (1) municipal policymakers

know that employees will confront a particular situation, (2) the situation involves a difficult

choice or a history of employees mishandling, and (3) the wrong choice by an employee will

frequently cause deprivation of constitutional rights." *Id.*  "Ordinarily, this requires a plaintiff to

identify a pattern of similar constitutional violations by untrained employees that puts municipal

decisionmakers on notice that a new program is necessary." *Johnson v. City of Philadelphia*,

975 F.3d 394, 403 (3d Cir. 2020) (internal quotations omitted).  "Otherwise, the plaintiff needs to

show that failure to provide the identified training would likely result in the violation of

constitutional rights — *i.e.*, to show that the need for more or different training was so obvious."

*Id.* (internal quotations and alterations omitted).  "Additionally, the identified deficiency in a

[municipality's] training program must be closely related to the ultimate injury; or in other

words, the deficiency in training must have actually caused the constitutional violation."

*Thomas v. Cumberland Cnty.*, 749 F.3d 217, 222 (3d Cir. 2014) (internal quotations and

alterations omitted).  "[T]he causation inquiry focuses on whether the injury could have been

avoided had the employee been trained under a program that was not deficient in the identified

respect."  *Id.* at 226.

At times in his Complaint, Taylor imprecisely attempts to equate all the conditions of

which he complains with broad policies or customs of Chester County.  He asserts there was a

general custom at CCP to "'fail to act' or protect . . . from all the malicious evil behavior"

alleged in the Complaint.  (Compl. at 10.)  Taylor similarly contends that he "has been subject to

all the malicious evil behavior by defendants as they continue to cause harmful procedures,

customs of harassment and mentally painful treatment" by failing to train officers and "forcing

undertrained officers to work 16 hr shifts with no administrative control or backup support."  (*Id.*

at 8-9.)  These allegations are pled in a generalized manner and appear to be predicated almost

entirely on Taylor's own experiences, which are insufficient bases for a plausible *Monell* claim.

*See Phillips v. Northampton Co., P.A.*, 687 F. App'x 129, 132 (3d Cir. 2017) (*per curiam*)

(affirming dismissal of complaint where "[o]ther than some wholly conclusory and highly

generalized assertions about unspecified patterns of misconduct, [plaintiff] pleaded no facts to

support the existence of any policy, custom, or practice beyond those involving his own

[experiences]."); *Groman v. Twp. of Manalapan*, 47 F.3d 628, 637 (3d Cir. 1995) (noting that

"vague assertions" of a policy or custom are insufficient to impose liability).  Further,

generalized allegations of insufficient staffing or training fail to state a claim where, as in this

case, the Complaint does not allege a specific pattern of constitutional violations by untrained

employees or other conduct from which deliberate indifference could be inferred in a manner

attributable to Chester County or Prime Care.  *See Brown v. Delaware Cnty. Prison Bd. of

Inspectors*, 741 F. App'x 135, 138 (3d Cir. 2018) (*per curiam*) ("Brown's vague and conclusory

allegation that the defendants had a policy or custom of 'fail[ing] to provide an adequate level of

security staffing,' is insufficient to state a claim").  Taylor's allegation that he was "refused

access to complain, voice or griev[e] his concerns over medical, security and injures," which he

attributes to a "custom and procedure" to "ignore, refuse or punish" him when concerns are

voiced, is similarly too conclusory and unsupported to state a claim.[5]  *See Benson v. Delaware*

*Cnty.*, No. 21-2854, 2022 WL 784475, at *4 (E.D. Pa. Mar. 15, 2022) (dismissing *Monell* claim

as "too conclusory" where inmate alleged that, "as a part of [Defendants'] policy or custom, they

'encouraged' Correctional Officers at George Hill 'to ignore grievances regarding pending

assaults'" without sufficient factual allegations about underlying incidents).  Additionally, this

allegation appears to be predicated on Taylor's improper amalgamation of various different

experiences he had into a generalized assertion of a custom.  It is more akin to "unadorned, the-

defendant-unlawfully-harmed-me accusation[s]" that are insufficient to state a plausible claim.

*Iqbal*, 556 U.S. at 678.

In contrast, Taylor has asserted two specific policies that he attributes to Chester County

and Prime Care that have directly impacted his specific medical needs.  First, he alleges that

Chester County and Prime Care approved and/or maintained a policy pursuant to which inmates

with dental issues would only be offered the option of pulling a tooth, regardless of the relevant

standard of care.  (Compl. at 8, 9.)  Second, Taylor alleges that Chester County and Prime Care

essentially have a policy pursuant to which they do not permit inhalers for asthma as a matter of

---

[5] Furthermore, to the extent Taylor is alleging a constitutional violation based on how his grievances were handled or inadequacies in the prison grievance system, such claims are not plausible because "prisoners do not have a constitutional right to prison grievance procedures." *Gerholt v. Wetzel*, 858 F. App'x 32, 34 (3d Cir. 2021) (*per curiam*) (citing *Massey v. Helman*, 259 F.3d 641, 647 (7th Cir. 2001) and *Flick v. Alba*, 932 F.2d 728, 729 (8th Cir. 1991) (*per curiam*)).

course, either on a preventative basis or as a matter of treatment. (*Id.* at 9.) Taylor alleges that

as a result of these policies, he experienced deliberate indifference to his serious medical needs

because he was not provided proper treatment for his cavities, and was denied access to his

prescribed inhalers, despite having asthma attacks.

To state a Fourteenth Amendment claim based on the failure to provide medical care, a

pretrial detainee must allege facts indicating that prison officials were deliberately indifferent to

his serious medical needs.[6] *See Farmer v. Brennan*, 511 U.S. 825, 835 (1994); *Moore v. Luffey*,

767 F. App'x 335, 340 n.2 (3d Cir. 2019) (holding that the standard under the Eighth

Amendment and Fourteenth Amendment for claims related to a prisoner's medical needs is

essentially the same for purposes of the analysis). A prison official is not deliberately indifferent

"unless the official knows of and disregards an excessive risk to inmate health or safety; the

official must both be aware of facts from which the inference could be drawn that a substantial

risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Deliberate indifference is properly alleged "where the prison official (1) knows of a prisoner's

need for medical treatment but intentionally refuses to provide it; (2) delays necessary medical

treatment based on a non-medical reason; or (3) prevents a prisoner from receiving needed or

recommended medical treatment." *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

"A medical need is serious, . . . if it is one that has been diagnosed by a physician as

requiring treatment or one that is so obvious that a lay person would easily recognize the

---

[6] "[T]he Eighth Amendment's Cruel and Unusual Punishments Clause does not apply until after sentence and conviction." *Hubbard v. Taylor*, 399 F.3d 150, 164 (3d Cir. 2005) (internal quotations omitted). Since Taylor has not yet been sentenced, (*see* Compl. at 6; *supra* n.1), he is classified as a pretrial detainee whose claims are governed by the Due Process Clause of the Fourteenth Amendment. *Id.* at 166 (holding that the Due Process Clause of the Fourteenth Amendment governs claims brought by pretrial detainees). To the extent Taylor asserts claims under the Eighth Amendment, those claims are dismissed.

necessity for a doctor's attention." *Monmouth Cnty. Corr. Institutional Inmates v. Lanzaro*, 834

F.2d 326, 347 (3d Cir. 1987) (internal quotations omitted).  Allegations of medical malpractice

and mere disagreement regarding proper medical treatment are insufficient to establish a

constitutional violation.  *See Spruill v. Gillis*, 372 F.3d 218, 235 (3d Cir. 2004).  "Where a

prisoner has received some amount of medical treatment, it is difficult to establish deliberate

indifference, because prison officials are afforded considerable latitude in the diagnosis and

treatment of prisoners."  *Hayes v. Gilmore*, 802 F. App'x 84, 88 (3d Cir. 2020) (*per curiam*).

At this early stage of the litigation, Taylor has alleged serious medical needs in the form

of his cavities, which caused him pain and sensitivity, and interfered with his ability to eat and

drink, and in the form of his asthma, which affected his ability to breathe and for which he was

prescribed treatment by a doctor.[7]  *See Board v. Farnham*, 394 F.3d 469, 480 (7th Cir. 2005)

---

[7] To the extent Taylor alleges that he was not provided a "teeth cleaning" as a matter of
preventative dental care, he has not described a serious medical need, so any constitutional
claims based on this allegation are not plausible.  *See Vaughn v. Cambria Cnty. Prison*, 709 F.
App'x 152, 155 (3d Cir. 2017) (*per curiam*) ("dental health care claim" would be futile to
amend); *see also Hallett v. Morgan*, 296 F.3d 732, 746 (9th Cir. 2002) (observing that "the lack
of routine teeth cleaning" did not establish deliberate indifference to serious medical needs);
*Rogers v. Cochran*, No. 20-185, 2021 WL 1877385, at \*11 (N.D. Tex. Apr. 19, 2021), *report
and recommendation adopted*, 2021 WL 1872584 (N.D. Tex. May 10, 2021) ("Rogers's desire
for routine dental cleanings, without more, does not constitute a serious medical need." (citing
cases)).  It is also not clear that Taylor's toenail constituted a serious medical need, *see, e.g.*, *Van
De Gejachte v. McGowan*, No. 12-620, 2012 WL 2411860, at \*10 (M.D. Pa. June 4, 2012),
*report and recommendation adopted*, 2012 WL 2409675 (M.D. Pa. June 26, 2012) (collecting
cases holding that minor toenail infections or injuries were not serious medical needs), but even
assuming it did, he has not sufficiently tied the events related to treatment of his toenail to a
specific policy or custom of Chester County or Prime Care.  Taylor also has not sufficiently tied
allegations related to treatment of his "stomach issues and chronic diarrhea," (Compl. at 16), to a
specific policy or custom in a manner sufficient to proceed against either Chester County or
Prime Care.  *See generally Sims v. Wexford Health Sources*, 635 F. App'x 16, 20 (3d Cir. 2015)
(*per curiam*) (summarily affirming dismissal of *Monell* claims against prison medical contractor
where plaintiff's "complaint stated that Wexford had an open practice, policy, or custom of
deliberate indifference in order to save money" and "[h]is statement of facts merely repeated
this").

13

(observing that several courts have "held that dental pain accompanied by various degrees of attenuated medical harm may constitute an objectively serious medical need" and citing cases); *Oke v. Biggins*, No. 18-214, 2019 WL 6702142, at \*3 (W.D. Pa. Nov. 15, 2019), *report and recommendation adopted,* No. 18-214, 2019 WL 6701455 (W.D. Pa. Dec. 9, 2019) (plaintiff alleged a serious medical need when he described cavity that went untreated for at least 28 days, "caused him to experience severe pain in his face, jaw, and neck," and "interfered with his ability to eat, drink, and sleep"); *see also Lee v. Young*, 533 F.3d 505, 510 (7th Cir. 2008) ("As a general matter, asthma can be, and frequently is, a serious medical condition, depending on the severity of the attacks." (internal quotations omitted)).  As to his cavities, Taylor alleges he was told by the dentist that the only option was to pull his tooth because, as a matter of policy, there are no options for fillings or a root canal "even if that is the correct treatment."  (Compl. at 16.) Liberally construing this allegation, the Court understands Taylor to allege that he was denied medically appropriate dental treatment because of a blanket policy that limits treatment for cavities to pulling teeth.  *See generally Pearson v. Prison Health Serv.*, 850 F.3d 526, 538 (3d Cir. 2017) (deliberate indifference can be found where prison officials "prevent an inmate from receiving recommended treatment for serious medical needs").

Regarding his asthma, Taylor alleges that he was denied access to his physician-prescribed inhalers, Dulera and Albuterol, pursuant to a policy of Chester County and Prime Care that prevents inmates from using inhalers for asthma as a matter of prevention and/or treatment.  As a result, Taylor alleges that his breathing worsened and he began suffering asthma attacks three days after his admission to CCP.  Nevertheless, he alleges that he still could not access an inhaler, perhaps with the exception of a period of time when it appears he was

14

permitted to use the inhaler his family provided for him.[8]  Taylor alleges that he was informed of

the relevant policy during a medical appointment with a nurse.  He was allegedly told on another

occasion that he was essentially limited to pressing the "call button" if he needed "rescue asthma

treatment," but he claims that he did not receive treatment when he did so upon suffering an

asthma attack.[9]  He also claims that many of his requests for treatment were ignored and that he

had difficulty accessing medical care.  At the screening stage, these allegations, construed

liberally and read favorably to Taylor, are sufficient to raise an inference that Taylor was denied

prescribed medical treatment for a serious medical need due to a blanket policy prohibiting use

of inhalers for asthma.  *See Board*, 394 F.3d at 485 ("[R]efusing an asthma patient his inhaler

when he is complaining of severe breathing problems could constitute a deprivation of a pretrial

detainee's constitutional rights").

In sum, the Court concludes that Taylor has alleged sufficient factual matter to proceed

on his claims against Chester County and Prime Care regarding the alleged policies that

impacted treatment of his cavities and asthma.  However, his other allegations against these

Defendants are insufficient to state a plausible claim.  Accordingly, Taylor's remaining claims

against these Defendants will be dismissed.

---

[8] It is unclear how Taylor was able to use the inhaler his family dropped off despite the alleged policy at CCP preventing inmates from using such inhalers.

[9] *Contra Iseley v. Dragovich*, 90 F. App'x 577, 580 (3d Cir. 2004) (*per curiam*) (affirming grant of summary judgment where "the District Court held that Iseley's Eighth Amendment rights were not violated by the implementation of a policy that effectively prohibited him from keeping his asthma inhaler in his cell while he was housed in the RHU at SCI–Mahanoy.  At the time, no inmate in the RHU was allowed to self-medicate without the specific recommendation from a medical professional.  In the case of inhalers, in particular, the prison sought to prevent inmates from using them to hide contraband.  The District Court found that Iseley, a mild asthmatic in 1999, could obtain his inhaler from the officer on the pod simply by pushing the intercom button in his cell.").

### B.     Claims Against Warden Phillips and Deputy Warden Roberts[10]

In a § 1983 action, the personal involvement of each defendant in the alleged

constitutional violation is a required element, and, therefore, a plaintiff must allege how each

defendant was involved in the events and occurrences giving rise to the claims.  *See Rode v.*

*Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1998).  "Suits against high-level government

officials must satisfy the general requirements for supervisory liability."  *Wharton v. Danberg*,

854 F.3d 234, 243 (3d Cir. 2017).  There are "two general ways in which a supervisor-defendant

may be liable for unconstitutional acts undertaken by subordinates."  *Barkes v. First Corr. Med.,*

*Inc.*, 766 F.3d 307, 316 (3d Cir. 2014), *reversed on other grounds by Taylor v. Barkes*, 575 U.S.

822 (2015).  First, a supervisor may be liable if he or she "'with deliberate indifference to the

consequences, established and maintained a policy, practice or custom which directly caused

[the] constitutional harm."  *Id.* (quoting *A.M. ex rel. J.M.K. v. Luzerne Cnty. Juvenile Det. Ctr.*,

372 F.3d 572, 586 (3d Cir. 2004) (alteration in original)).  "Second, a supervisor may be

personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed

---

[10] Taylor sued Warden Phillips and Deputy Warden Roberts in their individual and official capacities.  Suing an officer or employee in his official capacity is essentially a means of pleading claims against an entity of which the officer or employee is an agent.  *See Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985).  Accordingly, the Court will dismiss Taylor's official capacity claims as duplicative of his claims against Chester County, which is also named as a Defendant in this case.  *See Stanek v. St. Charles Cmty. Unit Sch. Dist. No. 303*, 783 F.3d 634, 644 (7th Cir. 2015) ("The district court correctly dismissed these defendants in their official capacity because the Staneks also sued the District."); *Cuvo v. De Biasi*, 169 F. App'x 688, 693 (3d Cir. 2006) ("Because Cuvo is suing Palmer Township, the suit against the officers in their official capacities is redundant."); *Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) ("The district court correctly held that the § 1983 claim against Martin in his official capacity as Superintendent is essentially a claim against the Board and thus should be dismissed as duplicative.").  The remainder of the Court's analysis as to these Defendants will focus on the claims raised against them in their individual capacity.

others to violate them, or, as the person in charge, had knowledge of and acquiesced in the

subordinate's unconstitutional conduct." *Id.*

Taylor's claims against Warden Phillips and Deputy Warden Roberts are premised on

generalized allegations that are insufficient to support a plausible claim.  Throughout his

Complaint, Taylor accuses these Defendants of failing to act to address numerous conditions he

claims to have experienced at CCP.  (*See, e.g.*, Compl. at 9 (alleging a failure to act or protect

Taylor "from all the malicious evil behavior claimed herein").).  "Allegations of participation or

actual knowledge and acquiescence, however, must be made with appropriate particularity."

*Rode,* 845 F.2d at 1207.  The Complaint fails to provide any factual specificity as to Warden

Phillips and Deputy Warden Roberts's involvement in any of the constitutional violations

alleged, their authorization or imposition of the policies in question, or their awareness of the

relevant events, customs, or policies.[11]  Rather, it appears they have been named as Defendants

because of their high-ranking positions at CCP, which is an insufficient basis upon which to hold

them liable under § 1983.  *See Robinson v. Delbalso*, No. 22-2378, 2022 WL 17248100, at *2

(3d Cir. Nov. 28, 2022) ("His conclusory statements that defendants Delbalso, Mason, and White

'created a policy or custom under which unconstitutional practices occurred' are insufficient to

allege personal involvement." (quoting *Parkell v. Danberg*, 833 F.3d 313, 331 (3d Cir. 2016)

---

[11] It is particularly unclear how Warden Phillips and Deputy Warden Roberts would be liable for the alleged constitutional violations predicated on lack of or inadequate medical care at CCP. *See Spruill*, 372 F.3d at 236 ("[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable with . . . deliberate indifference."); *see also Diaz v. Warden Lewisburg USP*, 630 F. App'x 148, 151 (3d Cir. 2015) (*per curiam*) (prison officials who were administrators and who "are not themselves physicians" were not liable for deliberate indifference where plaintiff could not establish that their "involvement in the matter consisted of anything more than, at most, receiving letters from Diaz expressing his dissatisfaction with the medical care he was receiving").

("To presume that [unconstitutional] practices arose from [an official's] policies merely because of his position . . . is to rely on respondeat superior."))); *Evancho v. Fisher*, 423 F.3d 347, 354 (3d Cir. 2005) (explaining that "merely hypothesiz[ing] that [a defendant] may have been somehow involved simply because of his position as the head of the [relevant office]" does not support an inference of personal involvement).  Further, to the extent these Defendants were named because they handled any of Taylor's grievances and/or were on the receiving end of some of his generalized complaints, which is unclear, such allegations are insufficient to establish the requisite personal involvement.  *See Brooks v. Beard*, 167 F. App'x 923, 925 (3d Cir. 2006) (*per curiam*) (defendants' alleged inappropriate responses to plaintiff's "later-filed grievances" were insufficient to establish those defendants' personal involvement in underlying wrongs); *Burk v. Crowe*, No. 19-5792, 2020 WL 42758, at *4 (E.D. Pa. Jan. 3, 2020) (plaintiff's "general allegation that he 'wrote to' Crowe, Cassidy, Budd, and Lagana 'when this happen[ed]' is too vague and undeveloped to state a plausible basis for liability against these individuals").

 In sum, Taylor has not alleged any basis from which it could be inferred that Warden Phillips and Deputy Warden Roberts were personally involved in any of the alleged constitutional violations described in Taylor's Complaint.  The Court will therefore dismiss the claims against these Defendants.

## IV.    CONCLUSION

For the foregoing reasons, the Court will grant Taylor leave to proceed *in forma pauperis* and dismiss his Complaint in part without prejudice.  Taylor's Fourteenth Amendment claims for deliberate indifference against Chester County and Prime Care based on their alleged policies pertaining to dental treatment and asthma, as described further above, are ready to proceed to service under Federal Rule of Civil Procedure 4 and 28 U.S.C. § 1915(d).  The remainder of

Taylor's claims are dismissed without prejudice.  Considering Taylor's *pro se* status, prior to directing service, the Court will give Taylor the option of filing an amended complaint in the event he can address the defects the Court has noted.  In the alternative, Taylor may advise the Court that he seeks to proceed only on his claims that pass statutory screening.

An appropriate Order follows, which provides Taylor further guidance on his options for proceeding.